James H. **JOHNSON, individually and as Personal Representative of the Distributees of the Estate of William H. Johnson, Deceased, Plaintiff,**

v.

The **SMITHSONIAN INSTITUTION and Michael Rosenfeld Gallery, Inc., Defendants.**

No. 97 Civ. 5190(CBM).

United States District Court, S.D. New York.

June 19, 1998.

Paul J. Hanly, Jr., Coblence & Warner, New York City, for Plaintiff.

Peter R. Stern, Berger Stern & Webb, New York City, for Defendants.

*OPINION ON MOTION TO DISMISS*

MOTLEY, District Judge.

Plaintiff James H. Johnson, individually and as personal representative of the distributees of the estate of William H. Johnson ("Johnson"), commenced this action on July 16, 1997 against defendants, the Smithsonian Institution ("Smithsonian") and the Michael Rosenfeld Gallery, Inc. ("Rosenfeld"), charging defendants with conversion, replevin, and constructive trust under the Federal Tort Claims Act, 28 U.S.C. § 2671, and violations of New York General Business Law § 349(a). Johnson was an artist in New York City in the 1930's and 1940's who died in 1970 following a lengthy period of involuntary confinement in a New York State psychiatric institution. His paintings are now in the custody of the defendants and others, primarily the Smithsonian.

Defendants have asserted numerous defenses. They allege, inter alia, that plaintiff lacks standing; that the court lacks subject matter or diversity jurisdiction; that plaintiff has failed to state a claim for conversion or replevin; that the statute of limitations on the claims has run; that plaintiff cannot sue in a representative capacity; that plaintiff has suffered no damages; that plaintiff has waived and abandoned his claims; that plaintiff's claims are barred by laches, res judicata, collateral estoppel, and the doctrine of unclean hands; that plaintiff has failed to join indispensable parties, including the parties plaintiff purports to represent as well as any other "distributees" who plaintiff does not represent; and that defendants have good title to the artwork.

On January 26, 1998, the court held a hearing to address defendants' various motions. The court then referred the parties to mediation. The mediation was not successful and the parties requested that the court rule on the previously argued motions.

The court finds and concludes that pursuant to the Rooker–Feldman doctrine there is a lack of subject matter jurisdiction over claims regarding artwork that was the subject of a 1956 New York State Supreme Court determination (the "1956 Order"). For purposes of these motions, the court will assume, as plaintiff has alleged, that an entity which is not a party to this action unlawfully kept some of Johnson's artwork prior to his incompetency, thus creating a class of paintings which were not subject to the 1956 Order.

## A. Chronology of Events

The following are the facts which are either alleged or undisputed by plaintiff. William H. Johnson was born in 1901 in South Carolina and was formally educated as an artist in the early 1920's at schools in New York and Massachusetts. Following his education, Johnson embarked on a successful painting career. From 1926 until 1947, Johnson created over 1000 artworks, many of which were allegedly exhibited at prestigious venues in the United States and abroad. During the same time period, Johnson received several awards and favorable reviews for his work, including a gold medal in 1929 from the Harmon Foundation for his distinguished achievements. The Harmon Foundation (the "Foundation") is allegedly a New York not-for-profit corporation. In 1947, while in Denmark, where he was living at the time, Johnson was diagnosed as suffering from syphilis-induced paresis and pronounced mentally incompetent. Johnson was then involuntarily confined in a mental institution in Central Islip, New York from 1947 until his death in 1970.

In connection with Johnson's hospitalization, the Supreme Court of New York State appointed a Committee of the Person and Property of Johnson ("Committee") to administer the assets of Johnson's estate during his incompetency. The Committee stored Johnson's artwork in a warehouse facility between 1948 and 1956. In 1955, the Committee applied to the Supreme Court for leave to file a final accounting of the estate. The Court granted the motion and appointed a Special Guardian to represent Mr. Johnson's interest. The Court also ordered that the Committee serve notice of the filing of its final account on, among others, the Special Guardian, Johnson, and Johnson's mother, who was a resident of and living in South Carolina. The Committee attempted to sell the artwork, apparently to no avail.

During the proceedings, the Committee informed the Court that the artwork, which had been in a warehouse for some eight years, and which the Committee had been unable to sell, had only nominal value. The Committee sought leave to abandon the artwork because it had no cash value. This petition for leave to abandon the artwork, like the notice of the filing of the final account, was served on the special guardian and on Johnson's mother. It is not clear whether Johnson's mother or any other member of Johnson's family was represented by counsel or aided by any informed party during the proceedings. There is no agreement as to what interests, if any, the family had or tried to exercise between 1947 and the 1956. On April 30, 1956, the New York State Supreme Court filed an unopposed Order granting the petition to abandon the art as worthless and to otherwise settle the final account of Johnson.

About one month later, the Harmon Foundation took possession of the artwork and allegedly expended considerable funds restoring it. In 1967, the Harmon Foundation transferred 1154 of Johnson's items to the Smithsonian, allegedly without consideration. The Smithsonian is currently in the possession, custody or control of some or all of those pieces.

Although there is a lack of clarity and consensus on past alleged claims by Johnson family members to obtain some of their relative's art, there is some evidence which points to the possibility that a demand was made of the Smithsonian as early as 1971 which resulted in two pictures being produced to two male family members.

At some point in the 1980's or 1990's, Rosenfeld, which, according to plaintiff, is a New York corporation, acquired certain pieces of Johnson's artwork. The complaint is unclear as to how Rosenfeld acquired the artwork. ¶ 21 ("Those [Rosenfeld's] pieces were among the items of Johnson artwork held by the Harmon Foundation ... or, alternatively, were among the items of stored Johnson artwork ...") In 1995, plaintiff allegedly demanded that Rosenfeld return to Johnson's heirs all of Johnson's artwork in its possession. This demand has not been met.

Most recently, on February 24, 1997, plaintiff allegedly demanded that the Smithsonian pay him money damages arising out of the Smithsonian's possession of Johnson's artwork. This demand has not been met.

## B. The Harmon Foundation

Much of the factual information about the events leading to the 1956 Supreme Court determination is vague and, especially with respect to the role of the Harmon Foundation, hotly disputed. The Foundation is not named as a defendant in this case but could well be an indispensable party. Plaintiff alleges that the Foundation acted as caretaker and agent for the sale of Johnson's artwork from 1929 to 1970. Johnson allegedly never voluntarily transferred ownership of any of his artwork to the Harmon Foundation. However, plaintiff alleges that the Foundation, unbeknownst to Johnson, kept some of his works even after Johnson requested that all paintings be returned to him prior to his 1946 move to Denmark.

According to plaintiff, the Foundation contacted the Committee late in 1955 regarding Johnson's stored artwork. Allegedly it was this Foundation which told the Committee that Johnson's stored artwork had no monetary value, despite the fact that the Foundation itself had awarded Johnson a gold medal and had successfully sold Johnson's artwork as his agent. A few weeks after the Foundation informed the Committee that Johnson's artwork had no value, the Foundation informed the Committee that it would undertake to receive and bear the cost of maintaining the entire inventory of Johnson's artwork. Plaintiff alleges that the Committee was never informed that the Harmon Foundation had been in possession of certain items of Johnson's artwork for a number of years before 1955. Plaintiff also alleges that the Committee never informed the Supreme Court of the State of New York about Johnson's distinguished career or the fact that the Harmon Foundation was interested in securing Johnson's work for itself. In short,

plaintiff argues that the 1956 Order was the result of the Foundation's silence.

Defendant Smithsonian stresses that the Foundation's involvement post-dated the Committee's decision to file for leave to abandon the stored Johnson artwork. The Smithsonian does not know whether, and does not concede that, the Harmon Foundation was a long-time agent of Johnson. Defendant Rosenfeld's answer to the plaintiff's complaint here denies the allegations concerning the Foundation's involvement in the valuation process which resulted in the determination that the art was worthless.

The record is unclear, speculative, and disputed on a number of points, including where, with whom, and under what auspices the art was located between 1929, when the Harmon Foundation first became involved with Johnson, and 1967, when all of the paintings were given without consideration to the Smithsonian from the Harmon Foundation.

## C. Artwork Subject to the 1956 Order: The Rooker–Feldman Bar

The Rooker–Feldman Doctrine stands for the proposition that federal district courts do not have jurisdiction to review state court judgments. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) (only the Supreme Court can entertain an appeal to reverse or modify a state court judgment) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (explaining that federal courts do not have jurisdiction over claims which are "inexplicably intertwined" with prior state court determinations).

▮ Noting the ambiguity of the "inextricably intertwined" standard, the Second Circuit recently explained that "if the precise claims raised in a state court proceeding are raised in the subsequent federal proceeding, Rooker–Feldman will plainly bar the action .... on the other hand ... where the claims were never presented in the state court proceedings and the plaintiff did not have an opportunity to present the claims in those proceedings, the claims ... are not barred." *Moccio v. New York State Office of Court Administration*, 95 F.3d 195, 199 (2d Cir. 1996). "The Rooker–Feldman doctrine at a minimum is coextensive with preclusion principles." *Doctor's Associates, Inc. v. Distajo et al.*, 107 F.3d 126, 137 (2d Cir.1997) *(citing Moccio)*.

▮ The 1956 New York State Supreme Court Order unequivocally allowed Johnson's art to be pronounced worthless. It specifically gave the Committee leave to abandon Johnson's artwork. Rather than throwing the paintings away, the Committee donated the art to the Harmon Foundation, which was ostensibly concerned about the art's historical significance. (Johnson was a black American artist. The Foundation apparently took a special interest in the artworks of black Americans during the so-called Harlem Renaissance of the 1920's and 1930's.)

However, the artwork was no less "abandoned" than it would have been had the Committee disposed of the work through some alternative means; what matters is that title and possession were relinquished. *See United States v. Cowan*, 396 F.2d 83, 87 (2d Cir.1983) ("The abandonment of property is the relinquishing of all title, possession, or claim to or of it—a virtual intentional throwing away of it") *(quoting Foulke v. New York Consol. R. Co.*, 228 N.Y. 269, 273, 127 N.E. 237 (1920)). To "abandon [is] to surrender one's claim or right to, [to] give up." *The American Heritage Dictionary* 66 (2d college ed.1982). By challenging defendants' possession of the artwork (in the form of the instant action), plaintiff is indirectly attacking the judicial determination in which he was represented which legally enabled the chain of events resulting in defendants' possession. Thus, plaintiff is barred, under Rooker–Feldman, from bringing claims before this court regarding artwork which was the subject of the New York Supreme Court's 1956 Order.

Plaintiff argues that Rooker–Feldman is inapplicable to this case because the parties and issues are different than those in the 1950's action and because preclusive effect is not given to judgments based on fraud. Plaintiff's conception of issues is too narrow. Although it is true that the 1956 Order was about the value and disposition of Johnson's artwork rather than the instant issues of

replevin, conversion, and constructive trust, the resolution of these issues would require a determination that the Johnson estate has a possessory interest in the paintings superior to the defendants. These interests were extinguished by the 1956 Order which allowed the Committee to abandon the art. *See also Zipper v. Todd*, 1997 WL 181044, *2 (S.D.N.Y.1997) ("While it is true that plaintiffs never actually raised the federal claims of Section 1983, RICO and SLAPP violations before the state court, Rooker–Feldman precludes district court review of claims 'inextricably intertwined' with state court determinations.")

Moreover, the inquiry in questions of preclusion is not only whether issues (such as Johnson's status as a successful, award-winning painter) were raised but rather whether they could have been raised. "Res judicata precludes a litigant from asserting claims that have been, or could have been, litigated in a prior action based on the same nucleus of facts. Collateral estoppel precludes a party from relitigating an issue which has been necessarily decided in a prior action and in which the party has had a full and fair opportunity to assert his or her claims." *Levitin v. Homburger*, 932 F.Supp. 508, 515 (S.D.N.Y.1996) (*citing West v.. Ruff*, 961 F.2d 1064, 1064 (2d Cir.1992) and *Polur v. Raffe*, 912 F.2d 52, 55 (2d Cir.1990)). The fact of Johnson's past success and recognition were things that could have been raised, as they had already occurred. Plaintiff does not contest that Johnson's special guardian and his mother both received notice in 1955 of the proposed abandonment or that the objection the special guardian did make (as to an issue unrelated to the artwork) was heard by the Committee and the mistake thereafter rectified. This fact indicates that the Committee was an accessible forum for Johnson. *Cf. Levitin*, 932 F.Supp. at 517 ("To the extent that Levitin considered this form of notice insufficient, his complaint is with [the state court] justice .") Instead, plaintiff erroneously appears to assume that if Johnson's past artistic success was not presented to the New York State Supreme Court, this omission *itself* proves lack of opportunity to raise that issue.

Plaintiff also argues that the 1956 Order was based upon fraud. Even if information on Johnson's status was fraudulently withheld from the court, the remedy is not a federal court action which post-dates the state court decision by more than 40 years. *See Smith v. Weinberger*, 994 F.Supp. 418, 423 (E.D.N.Y.1998) ("The fact that the plaintiff alleges that the State Court judgment was procured by fraud does not remove his claims from the ambit of Rooker–Feldman ... the Court finds that Smith's claims for conversion are merely a thinly-veiled effort to invalidate the State Court's foreclosure judgment."); *see also Zipper*, 1997 WL at *5 ("[T]his court lacks jurisdiction ... pursuant to the Rooker–Feldman doctrine.... Plaintiffs' allegations of fraud in violation of federal statutes are unavailing."); *Levitin*, 932 F.Supp. at 517—519 (explaining the two exceptions to Rooker–Feldman and noting that fraud is not one of them).

Generally, a party's remedy when a decision is based on fraud is to move to have the court which issued the decision vacate its own judgment. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). However, this court underscores that by raising the possibility of a state court action, it is not passing on the wisdom or even viability of this course of action. This court notes that the state court, no less than the federal court, is not able to hear stale claims and is unwilling to indulge plaintiffs who have long sat on causes of action.

### D. Artwork not Subject to the 1956 Order

Plaintiffs complaint alleges that "in 1946, Johnson informed the Harmon Foundation that he was moving permanently to Denmark, and specifically requested that all of the works it had been holding as his sales agent be returned to him [but] not all such works were returned." ¶ 12. The allegedly unreturned artwork shall be referred to as "the 1946 artwork." The complaint later states that the Committee stored "more than 1,000 pieces of the Johnson artwork ." ¶ 15. This work, of course, was later transferred to the Harmon Foundation, which, in turn,

"transferred to The Smithsonian approximately 1154 items of Johnson Artwork without consideration." ¶ 20. Thus, the complaint raises the possibility that as many as 154 pieces of art were in the possession of the Harmon Foundation even before the Committee transferred most of the art to it. By its contention that Rosenfeld may have acquired artwork from a source that did not pass through the Smithsonian, the complaint also implies that the Foundation did not give all of the Johnson artwork in its possession to the Smithsonian. The complaint does not allege that either named defendant had any actual or constructive knowledge about the Harmon Foundation's decision in 1946 to keep some of Johnson's art in its possession or its possible decision to withhold some or all of this art from the Smithsonian. Because these pieces were not in custody of the Committee, the 1956 Order did not apply to them. In short, Rooker–Feldman is not a bar to claims regarding this relatively small amount of work, and the court theoretically has subject matter jurisdiction over claims involving it.

Federal Rule of Civil Procedure 12(b)(7) provides that "failure to join a party under Rule 19" is a defense. Federal Rule of Civil Procedure 19(a) provides that "a person who is subject to service of process and whose joinder shall not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest." Defendant Rosenfeld's 12(c) Motion for Judgment on the Pleadings contains a timely motion under 12(b)(7). *See* Fed.R.Civ.P. 12(h)(2) ("A defense of ... failure to join an party indispensable under Rule 19 ... may be made ... by motion for judgment on the pleadings....."). This court agrees that the Harmon Foundation is a necessary party to claims regarding the 1946 artwork.

According to plaintiff, the Harmon Foundation is a New York not-for-profit corporation; as such, it would be subject to service of process in this District. With respect to subject matter jurisdiction, the court notes that there are numerous problems with subject matter in this case, even in addition to the Rooker–Feldman issue which, as explained above, disposes of claims regarding the great majority of Johnson's artwork. For example, as an alternative ruling as to defendant Rosenfeld, against whom there are only state law causes of action, the court might have found lack of diversity jurisdiction because of unresolved issues regarding the citizenship of the plaintiff and plaintiffs unclear status with respect to Johnson. As an alternative ruling as to defendant Smithsonian, the court might have found that plaintiff had not met the requirements of a claim under the Federal Tort Claims Act, the only federal claim in this action. In other words, by its invocation of Rule 19, the court is not holding that diversity has been properly established or that the federal cause of action under the FTCA has been properly pleaded. However, since defendant Rosenfeld is a citizen of New York, the joinder of the Harmon Foundation—also a citizen of New York—does not affect the court's subject matter jurisdiction. Rule 19 only requires that if the court has jurisdiction, the new party shall not deprive it of that jurisdiction.

Absent the joinder of the Harmon Foundation, "complete relief cannot be accorded among those already parties." 19(a). Absent the Foundation, this court could not begin to determine whether the Harmon Foundation unlawfully retained pieces of Johnson's art in 1946, or which pieces of the art were kept, or how Johnson came to learn of this tortious act without the presence of the Harmon Foundation in this action. As to the putative 1946 artwork, the Harmon Foundation is a necessary party.

When the court deems a party necessary under Fed.R.Civ.P. 19(a) and when joinder of that party is feasible, the court "shall order

that the person be made a party." Ordinarily, then, the court would order the joinder of the Harmon Foundation as to claims regarding the 1946 artwork. However, this court holds, in the alternative, that even if plaintiff is correct that the Foundation did not return all of the art in 1946, any action for recovery of chattel against the Harmon Foundation is barred by the statute of limitations.

 Claims for conversion and replevin in New York are three years. *See* NYCPLR § 214. "The rule in this State is that a cause of action for replevin against the good-faith purchaser of a stolen chattel accrues when the true owner makes demand for return of the chattel and the person in possession of the chattel refuses to return it ... a different rule applies when the stolen object is in the possession of the thief .... [i]n this situation, the Statute of Limitations runs from the time of the theft, even if the property owner was unaware of the theft at the time that it occurred." *Solomon R. Guggenheim Foundation v. Lubell*, 77 N.Y.2d 311, 317–318, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991) (citations omitted). "Accrual [of the statute of limitations in conversion actions] runs from the date the conversion takes place ... and not from discovery or the exercise of diligence to discover." *Vigilant Insurance Company of America v. Housing Authority of the City of El Paso, Texas*, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995).

Johnson allegedly requested that his art be returned to him in 1946. Allegedly, the Harmon Foundation tortiously held onto the art in 1946. The three year statute of limitations for conversion or replevin thus began running at that time, even though Johnson was allegedly unaware that the Foundation—which was the original tortfeasor, as opposed to a good-faith purchaser—did not return the art in spite of Johnson's demand. The fact that Johnson was insane as of 1947 does not operate to toll the statute of limitations under New York law because the disability did not exist at the time the cause of action accrued. *See* NYCPLR 208. Thus, there is no cause of action as to the putative 1946 artwork.

## CONCLUSION

For the reasons discussed above, the court dismisses this complaint under Fed.R.Civ.P. 12(b)(1) insofar as the complaint addresses the vast majority of the Johnson artwork that was subject to the 1956 Order. As to the putative 1946 artwork, the court holds that the Harmon Foundation is a necessary party under Fed.R.Civ.P. 19(a) and, alternatively, that claims against it are stale. Finally, Defendant Rosenfeld's Rule 11 motion will be addressed at a separate hearing. *See Chemiakin v. Yefimov*, 932 F.2d 124, 126 (2d Cir.1991) ("Although we have not previously been squarely faced with the question whether a district court that lacks subject matter jurisdiction over an action still may impose sanctions pursuant to Rule 11, we are persuaded by the analyses of those courts that previously have addressed the question, and which uniformly have answered the question in the affirmative.").